Call our next case, Nazareth Hospital St. Agnes Medical Center v. Secretary of the Department of Health and Human Services. May I please the court? My name is Joshua Walden. I'm from the United States Department of Justice, representing the Appellant Secretary of Health and Human Services. With the court's permission, I'd like to reserve five minutes for rebuttal. Okay. Thank you, Your Honor. The Medicare dysregulation at issue in this case excludes patients covered by a state charity care program. In Cooper, this court held that the statute permitted as much. The same Medicare dysregulation excludes patients who receive medical care through a federally approved and federally conditioned demonstration project under Section 1115. In the Deficit Reduction Act, Congress expressly authorized the Secretary to do that. The distinction between Section 1115 patients and state charity care programs is a rational one and therefore should have been upheld by the district court. Unlike Pennsylvania's GA program, the Section 1115 demonstration projects are ones in which the Secretary decides exactly which Medicaid requirements will apply and which will be waived. The Secretary decides how long the project will last, what costs will be considered Medicaid expenditures, and makes a determination that the whole project is, in the terms of the statute, likely to assist in promoting the objectives of Medicaid. In making this distinction, this determination, which we upheld in Cooper, the Secretary was acting within her discretion in a reasonable manner. That's correct. And Cooper did not deal with whether this was a violation of equal protection. That's correct. But the standard for violation of equal protection, was that in any way incorporated in the original determination that the Secretary made in determining that general assistance patients would not be included in the Medicaid medical assistance definition? Well, I think that clearly she's construing the statute reasonably. Presumably, she's also doing it with a rational purpose. And although the original promulgation of the rule didn't expressly address an equal protection question, I think that's normal and natural since no one raised it at the time. That's right. But I think Your Honor makes an excellent point, which is the issue in Cooper was whether the statute permitted the Secretary to make the regulation that she did. And having held that it does, the question now is sort of an even harder one, which is, okay, if the statute permits it, does the Constitution or the APA forbid it? But then that goes to an even higher standard, the one that everyone agrees applies here, which is the rational basis test. And it is the plaintiff's burden in attacking the regulation, which comes with a presumption of constitutional validity, in the words of the Supreme Court, to negative every conceivable rational basis that might exist for the program. And there are a lot of things that the plaintiffs attempt to do here to show some similarities between the program. But that's neither here nor there. They need to negate all of the conceivable rational bases for the distinction. But having established a rational basis, do we need to scratch our heads any further? No. Once a rational basis is established, that's the end of the question under both the equal protection analysis and – So if we agree with you, we can go home. I'll sit down right now if you all say that you agree with me, yes. Well, for purpose of equal protection, once we find there is a rational basis for different treatment, then haven't you kind of answered the equal protection argument because you've then found they are different? And they are permissibly different, so you can treat them differently. I think that's an excellent way to put it. If they're not similarly situated, they don't need to be treated similarly. Yes, that's exactly right. So – Well, I guess the issue, too, is who needs to be treated similarly? I was a little confused as to whether we're talking about hospitals, or are we talking about the patients, or are we talking about the programs? You know, that there is a program which is a Section 1115, and that is different from the state charity, the GA program, if you will. And so those programs are different, and for a valid reason. So are we then removed from the concept of, well, you're treating hospitals and patients differently? I couldn't kind of make that – And the hospitals would only have standing to complain about equal protection as it applied to the hospitals. To them. That's right. That's exactly right. And I think it sort of blends all the three, because the way the statute works is it's an additional payment to hospitals that is calculated on the basis of patients, depending on what programs they're in. Yeah, but I think you're right. The hospitals could only complain about equal protection for them. But no matter how you slice it, which of those three or all of those three you look at, there's still this rational distinction between a demonstration project that's federally controlled and approved and a GA program, which is not. And the district court expressly acknowledged it's a creature of state law. It's not a federally controlled program. And I think that alone is enough of a rational basis to sustain it. I'd be happy to go into more of the distinctions if Your Honor would like to, but I'm willing to sit down as well. Yeah, you reserved a lot of time for rebuttal, so. Okay. Thank you, Your Honor. Thank you.  I'm Mark Gallant, and I am counsel for the hospitals in this case. What's irrational about the government saying we've got this Section 1115 program, it's a specific program, states have to apply for it. If they apply for it and they approve, we will approve it, and we will approve the time. We will acknowledge or we will want to hear from them how it really is going to affect and improve Medicare over time. And it's going to be budget neutral. What's irrational about the government saying we're going to put something here that's different? What's irrational and what was described as irrational in, I think, 10 out of the 11 comments that we finally were able to pry out of the government from the rulemaking, is that the government was embracing two opposite pivotal distinctions with regard to waiver states and non-waiver states. The government in January. Two opposite pivotal distinctions. Yes, exactly. Up until January 20th, and this was what the position the government had taken in Cooper, up until January 20th, 2000, the government's position was no patient, no hospital, in a waiver state, in a Medicaid plan state, no patient can be counted by any hospital in any state unless the patient is eligible for traditional Medicaid benefits, because at that time the government construed the Medicare DISH statute as requiring Medicaid eligibility. And they decided to make an exception to that? Well, the statute either requires it or it doesn't require it. And it's like the Mwekma case. A government can't say a statute means one thing and then with respect to other individuals apply the same statute in an opposite fashion. But haven't they decided in Cooper that it does? Cooper didn't address the question of this regulation and the fact that as of January 20th, the Secretary retreated from the Medicaid eligibility requirement. He addressed the issue that general assistance patients will not be considered in the base for Medicare reimbursement when you're considering who, which patients are Medicaid eligible, right? No, because Cooper involved, the government lumps together, the government describes charity care programs as GA programs. If there's any character, if there's any programs that are distinct, it's those two. What, the general assistance program? No, general, if I may, Cooper involved patients who were not covered by any insurance program, who were not covered by the New Jersey Medicaid program. Well, okay. They were bad. They're dealing with a state program. Pennsylvania is dealing with a state program where the state program is mentioned in the Medicaid, state Medicaid program as existing, but it's not regulated by it. It's not funded on a patient-by-patient basis by it. It is. That's what Judge Ludwig, that's what Judge Ludwig. Not on a patient-by-patient basis. With all respect, Your Honor, it is, and that's what Judge Ludwig found. The government kept insisting that, if I may, a charity care program, the patients are not covered at all. It's free care. And then in exchange for that, there's a pool of money, and a hospital gets a portion of the pool of money at the end of the year based on uncompensated care. That's completely different from the state plan. In 1994, effective 1994, state plan amendment 9408, which was the focus of Judge Ludwig's analysis, the state of Pennsylvania applied specifically to make specific payments for individual patients, for inpatient care, if they satisfied an income eligibility standard of 47 percent of federal poverty level, which was AFDC. It's in the state plan, and it specifies that it is regarded as a type of medical assistance, and the hospital is to regard those patients as medical assistance patients, and payments are made invisibly as though those are Medicaid patients. So there are patient-specific payments made in the state plan. From the state treasury? No, not from the state treasury. They're Medicaid payments. That's the record in this case. The record in this case is that from a hospital standpoint, one doesn't even know whether a general assistance patient is traditionally eligible for Medicaid or not. They all carry the same card. They walk in the door. They have a Pennsylvania Medicaid card. The purpose of the Secretary's approval of SBA 9408 was not to, just to see if it complied with Medicaid, not to determine whether you were correct or not correct how you allocate the funds. The whole notion of allocation of funds is it's not about allocation of funds. It's individual payments for individual hospital services. That's what was approved in 9408, and that's why the commenter said to the Secretary, what you're saying makes no sense. You're making a presumption that GA days, which can vary from one state to another, are the same as charity care where there's no payment made. And in this particular case, it makes absolutely no sense, because since 1994 in Pennsylvania, the Secretary approved the state plan that describes GA patients, that says that those patients are eligible for medical assistance, and that says that the hospitals will receive for those patients payments that are no different than any other Medicaid payments. That wasn't Cooper. Mr. Gallant, I'm not hearing why the Secretary cannot do what was done here. That is, say that we have Section 1115, which has been established for specific purposes, and we're going to say that we're going to treat the hospitals and patients that are part of that differently from regular state, because it's a demonstration project, because it's approved in a different way, because it's specifically budget neutral. It's almost like we want to do a pilot project, and so we're going to treat some people differently. Why can't they say that? What's irrational and wrong about that? What's wrong with that is that, first of all, if I can just address briefly what a waiver is. What a waiver is, as Judge Randolph explained in the Cookville case, is it's a traditional Medicaid program where some of the regulatory requirements can be waived. This is not a wholesale difference among programs. The Secretary has always treated these hospitals. These are to get the waiver, the state has to file to request this, and it has to be something that is going to promote Medicare or Medicaid, and we have a list of which states have applied and how long they exist, et cetera, et cetera, and when they expire. And these are different, and the purpose of that is so different. The purpose is how do we improve this? It's experimental. Well, Judge Ludwig wanted to know whether they were different or not different, and he afforded the Secretary the opportunity to explain that. Okay, but we don't want to know. I mean, Judge Ludwig asked a lot of questions that we aren't interested in knowing the answer. I'd like to hear you address Judge Rendell's question. Why can't the Secretary do that? Because the Secretary can't simultaneously say that to be counted under the Medicare statute, a patient must be Medicaid eligible. We'll make an exception because we have a specific program we want to promote. But there's no basis in the Medicare statute for an exception. And if you're going to make an exception, then you're saying I no longer am reading that statute, which is what the Secretary acknowledged in 2000. We're no longer reading that statute as requiring that patients be Medicaid eligible. We're going to allow days to be counted in waiver states, as long as the inpatient care is regarded as funded under Medicaid. And in Pennsylvania, those days — Did Pennsylvania ask for a waiver? Pennsylvania didn't need a waiver. Pennsylvania had approved 9408, which did the exact same thing. It permitted Pennsylvania to pay hospitals for non-Medicaid eligible patients who are poorer than the patients in the typical waiver state. But it could have said, oh, we're going to put together something that we think is going to help Medicare. They could have filed for a Section 1115 waiver under a certain program if they jumped through certain hoops and got the approvals. And that wasn't done, right? The same patients were covered without the need for a waiver. I'm going to ask you about the same patients. Could Pennsylvania not have put together a program and an application to file to get a Section 1115 waiver if they had a way that they thought they were going to improve Medicare or Medicaid and seek the Secretary to sign on the dotted line, and that would have resolved your problem, would it not? You would have then qualified and would have been treated the way they're treated, correct? That's correct. If Pennsylvania had applied for a waiver, then these patients would have been deemed to be accountable. But the point is, in relevant respects, there's no difference. The Secretary — Well, there is a difference to the Secretary. And isn't it a rational difference? Because the Secretary has said, we have these specific plans which we will approve for a waiver, for experimental programs for the benefit of improving Medicaid, and if Pennsylvania feels that its program will offer such a program, we'll approve it. But if they don't, then by statute and by regulation, we don't have to consider it. That's the government's argument. Yeah. But that affords a dignity to a waiver that it doesn't deserve because, as this Court explained in Medora — Well, it's a statutory waiver. It's a waiver of certain regulations of Medicaid. Yeah, right. The waiver provision simply allows the Secretary to say, in your state, we will allow you not to comply with certain portions of the Medicaid statute. That has no impact on whether or not, under the Medicare statute, a patient who's a poor patient should be counted if they're funded versus Medicaid eligible. Until 2000, the Secretary has always lumped these categories together. They have never been treated as separate categories. But is it our job to say that because the Secretary changed the treatment of something that she's not allowed to do it? And is it our job to second-guess distinctions that have been seen to make sense? It's the Court's job to scrutinize when the Secretary draws a distinction, whether it's a rational distinction and it serves a stated purpose. And when the Secretary in 2000 said, I have an epiphany, I no longer read the Medicare DISH statute as mandating eligibility. And I instead believe that if the hospital is treating low-income patients, whether or not they're Medicaid eligible, as long as those patients are funded under or regarded as funded under a Title 19 plan, they can be counted by hospitals. And that critical set of facts doesn't draw any distinctions between what was going on in Pennsylvania and the waiver states. Because the rationales given in the regulation for reversing field on Medicaid eligibility for waivers were, oh, we've seen the light. These patients from now on will be regarded as funded under Title 19. And Pennsylvania GA patients have always been funded under Title 19 because there is individual eligibility. And it's set forth in the record in the state plan, which as Judge Ludwig repeatedly noted, the Secretary refused to look at the state plan that actually was relevant in this case. So a waiver state treats somebody inpatient care as though it's funded under Title 19. In approving SPA 9408, the Secretary directly approved the funding of GA patients under Title 19. But GA patients are not Medicaid patients, right? Right, but neither are waiver expansion patients. Right. That's the point. But that's why they're under the waiver. That's why there are exceptions. But the exception under the waiver is to treat their costs as covered by Title 19. That doesn't draw any distinction from GA patients. Because GA patients, whose inclusion in the plan was scrutinized by and approved by the Secretary, have been approved for payment. Their inpatient services are individually paid for as services under Title 19. So by saying we're going to allow waiver patients to be counted if their services are regarded as funded under Title 19, aligns them with, doesn't distinguish them from Pennsylvania GA patients, because one set of patients is regarded as being non-Medicaid eligible, but having their days funded under Title 19. And the other set of patients are also not Medicaid eligible, but poorer than the typical waiver payment. And their care is funded under Title 19, and in Pennsylvania in particular, through 9408. And so as a result of that, there was no difference. And, in fact, the Pennsylvania hospitals, under the plan approved by the Secretary, were paid for GA patients whose income levels were at or below AFDC levels. As the evidence compiled on the remand demonstrated, you have states like Delaware, where waiver patients are at 100% of the federal poverty level. The hospitals are otherwise identically situated. And the sister hospitals. You have a Section 1115 waiver in Delaware, right? Right. So why doesn't Pennsylvania do that? Because you have a choice of ways to run the program. And the Secretary has never distinguished in the DISH world, until 2000, between whether you have an 1115 waiver or whether it's a traditional program. But then they're distinguished. And don't we have to respect that distinction? Not when the very reasons given for the distinction are flatly contrary to the record and ignore the state plan. The Secretary first granted this decision on the assumption, and my time is up, so. Just finish the answer, if you would. Yeah. The Secretary granted the distinction initially on, I don't have to look at this because the regulation that created the discrepancy didn't apply during the cost year. Judge Ludwig correctly determined that they were wrong about that, that the regulation did apply. He looked at this and said, I see no basis for this distinction. You have two states that are operating parallel programs, and they're technically different mechanisms, but the keystone is, are the patients Medicaid eligible, and is their care paid for through Title 19? And it turned out that in Pennsylvania, the care is paid for under Title 19, and the patients are even poorer than the typical waiver patients. The judge therefore remanded it to say, show me why this is rational. And at the end of the day, the agency came back and said, the patients in the Pennsylvania waiver program are not paid for under the state plan, and they reached that conclusion by saying that SPA 9408 does not provide for GA patients, which in fact it squarely does. It sets forth payments for GA patients, and the result was that there was a lot of smoke and mirrors here, but substantively there's no difference. And the MedPAC report, the government watchdog report said the same thing. Nine out of 11 comments said the same thing. When you look at the facts, a waiver merely is I can take some part of the program and allow you to modify the rule. The government, the secretary has always said for Medicaid waivers and GA programs or charity care, all that matters is, is the patient eligible for Medicaid. Until 2000 when the secretary said it no longer matters if you're eligible for Medicaid if you're in a waiver state, because from now on we're going to regard those services as paid for. And that didn't change. That put them in alignment with Pennsylvania, not the other way around. Thank you. You're welcome. Thank you. The district court accorded great significance to SBA 9408, as do the hospitals. What, in your view, is the significance of that? I don't think that there's much significance at all to that. First of all, as a broad matter, I think in both equal protection and rational basis analysis, you're reviewing the secretary's decision directly. You're not making any sort of deference to the district court's judgments about those matters. But I think the only question that you need to ask under either analysis is whether there's a rational distinction between the two programs. And for all the reasons we've gone over today, there is a rational distinction that the administrator expressly pointed to the difference between a federally controlled and approved program and the state's program, which is not. Once that rational basis is accepted, as it should be, the analysis is done. And all of these questions about how exactly the state GA program works and all its questions about funding are essentially irrelevant once a rational basis is established. The secretary offered budget neutrality as a distinction, that the Section 1115 waiver programs had to be neutral from a budgetary standpoint. Is that a real distinction? How does that set it apart from the state programs? Well, I think what it does is it requires certain budgetary requirements for someone who applies for the waiver program as part of the overall package. And because the GA program is not a waiver program and is not subject to federal control, it doesn't have to do that. It may choose to do that on its own, but it's not a requirement that the federal government imposes on the state. And that's just another of one of the many other distinctions. It adds on. It's not determinative in this case, but it's another point that the administrator pointed to. Why would Pennsylvania not have sought 1115 waiver? Is it an onerous process? I mean, I have no context in which to put this whole 1115 waiver program. You know, I'm really not in a position to answer that without just speculating that maybe they don't want to go through the paperwork, maybe they want to be free to pick and choose the Medicaid requirements they want rather than have them be imposed by the secretary. But that would just be all speculation on my part. I really can't represent it. But there are many more bells and whistles in that program that are controlled by the federal government as compared to the state picking its own plan. The core of it, of who's treated and what care they get, is determined by the secretary. The GA program, that's decided by the state. And that's one of the most fundamental differences. Now, the hospital said that the Pennsylvania GA patients, their care is funded by Medicare? Medicaid? They say Medicaid. I would say two things. One, that's wrong as a matter of law. But second, even if they were correct that they were funded in the same way, their burden in an equal protection case like this under rational basis is to negate every conceivable rational basis for sustaining the law. They might be right on that they're wrong, but even if they were, it doesn't negate all of the rational distinctions that we've gone over over and over again in this case about how it's federally controlled, federally conditioned. The secretary makes determinations, decide how long it lasts. None of those go away, whether the funding were the same or different. But I will say, just to end the point, which is it's conceded in this case in the complaint and in the stipulation that GA patients are ineligible for Medicaid. Because they're ineligible for Medicaid, Medicaid doesn't pay for their care. Now, there's a circuitous route, which is a little bit sort of hard to follow, about how the Medicaid dish payments, which are different from regular Medicaid matching funds, travel eventually to these hospitals that treat GA patients. But that doesn't mean Medicaid, in the traditional matching fund sense, pays for their care. It doesn't. So they're wrong about the funding, and it really wouldn't matter as a legal matter if they did. The last point I'd like to make, Your Honors, if I may, is Judge Rendell, you asked at one point, why can't the Secretary make this distinction between demonstration projects? And the only answer that I heard was that the Medicare statute doesn't, the dish statute doesn't provide for that kind of an exception. I just want to point you to the fact that the dish statute itself says in the calculation, consider two groups of patients. One, those who are ineligible for Medicaid, and two, those who aren't ineligible for Medicaid but are in a Section 1115, Congress did it expressly, and when it added that language, it specifically said in the public law, we're ratifying, and that was the word it used, the Secretary's distinction, dating back to the regulation in 2000, that it's an issue in this case. So it does come directly from Congress. And I'd ask you, with that, to reverse the judgment of the district court. Thank you. Thank you. The case is well argued. We'll take another five minutes.